## Salyer, et al. v. Salyer.

(Decided January 19, 1911.)

### Appeal from Magoffin Circuit Court.

1. Contracts—Verbal Merged Into Written.—The law presumes that all preliminary conversations leading up to a written contract have been inserted in, or rejected by, the written contract, and that it expresses the final and completed agreement of the parties.

2. Same—Cancellation.—The cancellation of an executed contract is an exercise of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear.

3. Same—Fraud.—In order to justify a court in rescinding for fraud a written contract formally entered into, the evidence of fraud in its procurement by either party should be clearly established. The court will not lightly set aside a contract made under such circumstances.

4. Same—Knowledge of Vendor.—Where the party seeking the rescission of a contract for the sale of timber, had lived upon the property for thirty years, and had every opportunity to acquaint himself with the amount of the timber upon his land, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted the examination with diligence.

5. Same—Acting Upon Knowledge.—Where each party examined the timber and was acting for himself in the transaction, the seller had no right to rely upon the representation made by the buyer as to the number of trees standing upon the land.

6. Representation—Not Relied On.—Where the seller of timber did not rely upon the representation of the buyer as to the number of trees standing upon the seller's land, the seller has no right to complain if the buyer misrepresented the number of trees.

D. D. SUBLETT, R. H. COOPER and W. W. M'GUIRE for appellants.

AUGUSTUS ARVETT and J. H. GARDNER for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

By their deed of July 26, 1909, which was duly recorded, appellee, Jackson J. Salyer, and his wife sold and conveyed to their sons, the appellants George and and Arthur Salyer, all the trees 18 inches and upwards in diameter, upon a certain described tract of 110 acres of timbered land in Magoffin county, for $2,250. The purchase price was to be paid out of the timber, with a lien upon the timber as security therefor. The deed did not provide a time for the payment of the purchase price, but appellants gave appellee a note for it payable in eighteen months thereafter. The sons went to work cutting the trees and sawing them into logs, and had cut 86 trees, which made about 400 logs, when their father, on August 20, 1909, and within less than a month after the sale was made, brought this suit in equity, asking judgment for $2,250; that his lien be enforced; that the timber be sold to pay his debt, and that an injunction be granted restraining the defendants from cutting and removing the timber. As a ground for this procedure, J. J. Salyer alleged that his sons agreed to pay the $2,250 when they took possession of the timber and began the removal of it; that they were insolvent; that if they were permitted to continue cutting and converting the timber, without paying therefor, great and irreparable injury would result to the plaintiff. The clerk granted the injunction, which was sustained by the court, and is still in force.

Shortly thereafter the appellee filed an amended petition, in which he withdrew all that portion of the original petition and the prayer thereof, by which he sought to recover judgment on the note; and for a new cause of action he alleged that the true contract between the parties was for a sale of 600 trees on appellee's land for $2,250, which sum was to be paid when the timber was placed by the appellants on the bank of Big Half Mountain creek, a tributary of the Licking river. The amended petition charges that his sons caused the deed to be prepared conveying to themselves all of the trees upon appellee's land (which were about 1,400 in number), instead of 600 trees according to the true contract, that appellee, having implicit confidence in the honesty of his sons, signed the deed without reading it or acquainting himself with its contents, and that he took the note in his possession without observing the time of its maturity. He further alleges that he was greatly surprised when, within a few days after the trade, he discovered that the deed conveyed all of his trees 18

inches in diameter and upwards, instead of 600 trees of that size, and that the note was not due until 18 months thereafter; that there were more than 1,400 growing trees, 18 inches and upwards in diameter, upon said land, which were reasonably worth $5,000; that the inequality between the real value of the 1,400 trees and the purchase price of $2,250, called for by the written contract, was so great and flagrant that appellee would not have consented to said trade or executed the deed had he understood it, or had he understood the time for payment given in the note; that he was old, and was overreached and defrauded by his sons, and that they covertly, secretly and fraudulently induced and persuaded appellee and his wife to execute the deed of conveyance which appellee was ready and willing to cancel and rescind; that the defendants were giving out in speeches that they intended to cut and remove all of appellee's trees and sell them without paying him therefor; that the 600 trees were well worth $2,250, and that the appellants were insolvent. The amended petition asked a recission of the contract evidenced by the deed and note; that the deed be canceled and held for naught; that his sons be compelled to restore conditions existing before the conveyance was made, and that appellants be restrained from further cutting said trees.

The appellants denied all the material allegations of the petition and called upon appellee to file said note, which he has failed to do. Furthermore, they asserted that the contract as written represented the trade between the parties; that appellee fully understood it when he executed it; that they had in good faith attempted to carry it out, and had offered to, and were willing to give the appellee security for the payment of the purchase price of the timber.

Upon final hearing the circuit judge reformed the deed so as to make it convey only 599 trees for the $2,250 purchase price, with a lien on the trees to secure the payment of the purchase price, and enjoined the appellants from removing any of the timber until they should give bond with good surety for the payment of the $2,250; and that part of the deed which conveys more than 599 trees, was canceled.

Appellee testified that he sold to his sons all but eight of the 607 trees on the land described, and that he reserved there eight trees for his personal use in making certain repairs on the farm. Appellee had been talking with his sons for some five or six months with the view

to either selling them the trees standing upon this land, or making a contract by which they could cut and market the timber upon shares, or halves, as they called it. Finally, in July, 1909, the appellants and Sprague went to the house of the appellee for the purpose of talking over the proposed contract. They spent several days at appellee's house; and during that time they repeatedly went over the land for the purpose of viewing the trees. On one occasion all four of them started out together, and finally separated, the appellants going together in one direction, and the appellee and Sprague going in another direction. Appellee had theretofore offered the trees to appellants for $2,200, and, finally, on July 26th, the contract was struck, by which appellants agreed to pay appellee $2,250 in the manner indicated in the contract. Thereupon the deputy county court clerk was called in by common consent, and drew the contract between the parties. There is no proof that the trees on the land were worth $5,000, or any sum in excess of the $2,250 called for by the deed.

The only evidence tending to support the charge of fraud is contained in an incident that occurred while the clerk was writing the deed. When he came to describe the property sold, some one suggested that he describe it by giving the number of the trees at 607, while one of the appellants suggested that it would be easier to give the general description or boundary of the land by reference to the adjoining farms; and the latter method was followed. This suggestion grew out of the fact that, some five or six months before the sale, appellants' father had asked them how many trees there were having a diameter of 16 inches and upwards, and they replied that there were something over 600. This answer evidently led to the suggestion of making the description give the number of trees instead of the boundary. But it is evident, beyond any question, that appellee did not rely upon this statement or report by his sons, and that it did not induce him to make the contract. New York Life Insurance Co. v. Hord, 25 Ky. Law Rep., 1531. Pomeroy, in his Equity Jurisprudence (Sec. 890), says:

"Another element of a fraudulent misrepresentation, without which there can be no remedy, legal or equitable, is, that it must be relied upon by the party to whom it is made, and must be an immediate cause of his conduct which alters his legal relations. Unless an untrue statement is believed and acted upon, it can occasion no legal injury. It is essential, therefore, that the party ad-

dressed should trust the representation, and be so thoroughly induced by it that, judging from the ordinary experience of mankind, in the absence of it he would not, in all reasonable probability, have entered into the contract or other transaction.''

And, as to when one party is justified in relying upon the representations of another, Pomeroy says:

''As a generalization from the authorities, the various conditions of fact and circumstance with respect to the question how far a party is justified in relying upon the representation made to him may be reduced to the four following cases, in the first three of which the party is not, while in the fourth he is, justified in relying upon the statements which are offered as inducements for him to enter upon certain contract: 1. When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement. 2. When, having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prosecuted it with diligence. 3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties. 4. But when the representation is concerning facts of which the party making it has, or is supposed to have, knowledge, and the other party has no sush advantage, and the circumstances are not those described in the first or the second case, than it will be presumed that he relied on the statement; he is justified in doing so.'' (Sec. 892.)

The clerk, who drew the deed, carefully read it over to appellee and his wife, and explained it to them fully; and there is every reason to believe they understood it. Furthermore, the appellee had lived upon this property for thirty years, and certainly knew more about it and the quantity of timber upon it, and had more opportunities to acquaint himself with these facts than either of his sons. Evidently, appellee was anxious to sell the timber, and, if he could not make a trade for cash, he was willing to allow the boys to buy it upon shares. He helped them make their money arrangements by which they bought teams to market the timber. Appellee afterwards told Brown in the presence of Allen, that he had sold all of his timber within his boundary, and he seemed pleased at the good price he got for it. In going over the and and examining the timber, the sons were acting in

their own behalf, and it is not pretended that they were acting for their father. Sprague, who went over the land with the father, and who heard the talk from beginning to end which led up to the contract, says that the deed agrees with the contract, and that he talked with appellee the afternoon of the trade, and appellee expressed himself as entirely satisfied with the contract. Furthermore, George Salyer was somewhat in doubt about the wisdom of his contract, and the next day offered his father $5 to rescind it, but his father declined the offer. In the fact that the sons had said there were about 607 trees on the place, and appellee had reserved eight trees for his personal use, we have the foundation for the claim that the sale was really for only 599 trees. We are satisfied, however, that this version of the contract was an after-thought, and was not a material part of the contract as originally made between the parties. For, if there were more than 600 trees of the designated size upon the land, there was no necessity whatever for the appellee to reserve his eight trees. The reservation of the eight trees is consistent only with the idea that the appellee sold all of the trees of the designated size. If there were 1,400 of such trees, and appellee sold only 600 of them, why did he reserve eight trees when he still had 800 remaining? Furthermore, there is no claim or evidence that any particular 600 trees of the designated size were sold. The appellee was only fifty-six years old, and under ordinary circumstances should have been in his prime, mentally. There is no evidence that he was not more than a match for either of his sons in this respect. After the appellants had worked about thirty days, at an expense of about $500.00 by way of preparation and expenditures in getting out the timber, they were stopped from further work by the injunction herein. Thereupon they offered to secure their father in the payment of the purchase price by giving him a mortgage upon their teams and land and the timber mentioned in the contract; but the appellee not only declined to do so, but drove appellants' workmen from the land and refused to permit them to do anything further towards carrying out the contract. Appellee now asks that the contract be rescinded and the conveyance canceled. He has not asked that the contract be reformed. He has not surrendered the note, and he should not be permitted to rescind the contract, even though he had made out his case, without compensating the appellants for their loss by reason of the recission.

The charge that appellants had stated that they would remove the timber without paying therefor, is strongly denied by them, and there is not sufficient evidence to overcome that denial. The law presumes that all preliminary conversations leading up to a written contract have been inserted in, or rejected by the contract, and that it expresses the final and completed agreement between the parties. In order to justify a court in setting aside a contract thus formally entered into, and after mature deliberation, by the parties, the evidence of fraud in its procurement by either party should be clearly established. The court will not lightly set aside a contract made under such circumstances. The cancellation of an executed contract is an exercise of the most extraordinary power of a court of equity, which ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear. (6 Cyc. 336.)

In McCall v. Bushnell, 41 Minn., 37, the court said:

"It is inexpedient, upon grounds of public policy, that a solemnly executed instrument, known at the time to have been executed for the very purpose of embodying and evidencing the agreements and accomplishing the purposes of the parties, should be set aside upon the ground of fraud, unless the proof be clear and strong."

The contract should have been carried out by the parties, and the court erred in rescinding it in part and in reforming it in any respect. However, since the appellants have offered to give the appellee surety for the payment of the purchase money which will be due within a very short time, they will be permitted to carry out their contract upon giving that surety; and their time for completing the contract and paying the purchase money will be extended by adding to the time of the contract, the period during which they have been prevented from working by reason of the injunction herein. If, upon a return of the case, the appellants be either unable or unwilling to give this security, they may be made whole by reason of the appellee's breach of the contract by such legal remedies as may be appropriate under all the circumstances. The injunction was improperly granted, and will be dissolved.

Wherefore the judgment is reversed and cause remanded for further proceedings consistent with this opinion.